IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                CRIMINAL NO. 2:21-00087

MARK BOLLING

### MEMORANDUM OPINION

On February 2, 2023, the court held a hearing on defendant's motions seeking a <u>Franks</u> hearing and to suppress evidence recovered from a search at 117 Keystone Drive in Charleston, West Virginia.  Present at that hearing were defendant, his counsel, Brian D. Yost, and Assistant United States Attorney Nowles H. Heinrich.  On February 9, 2023, the court denied defendant's motions.  This Memorandum Opinion sets out more fully the reasons for those rulings.

### I.  Background

In September 2020, members of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began to investigate defendant Mark Bolling for drug trafficking and violation of federal firearms laws.  Officers with an ATF task force received information from a Source of Information that Bolling was a drug dealer.  The Source of Information was Brett Yates.  Yates described Bolling's residence at 117 Keystone Drive, in Charleston, West Virginia, to law enforcement, as well as the layout of the driveway and outbuildings.  Although Yates described the building as a two-story, four-unit apartment

building, he told ATF that Bolling lived in the top-left apartment and used the rest of the units to store guns and drugs. According to Yates, the other apartments were unoccupied.

Yates reported observing multiple firearms and several ounces of suspected heroin and methamphetamine inside Bolling's residence.  He also told ATF that Bolling was likely a convicted felon.

ATF conducted surveillance of Bolling's residence, searched tax records on the property, and ran Bolling's criminal history. After requesting a mail watch from the United States Postal Service, ATF was informed that 117 Keystone Drive was not receiving mail deliveries.

On September 16, 2020, ATF used Yates to make a controlled-purchase of methamphetamine from Bolling.  The controlled-buy took place at Bolling's residence and Yates reported seeing a handgun near Bolling during the buy.  A video recording of the controlled-buy captured Bolling discussing possessing and selling one or more firearms.

Three days later, on September 19, 2020, Bolling was arrested in Fayette County, West Virginia.  A Fayetteville police officer, who was not affiliated with the ATF investigation, conducted a traffic stop and recovered approximately 100 grams of methamphetamine, 30 grams of suspected heroin (later identified as fentanyl), ammunition, and over $7,000.00 from a vehicle

(Nissan Kick) Bolling was driving.  During the course of Bolling's arrest, a cell phone was also seized from Bolling. That cell phone was transferred to ATF custody on September 23, 2020.

On September 21, 2020, ATF Special Agent David Bullard drafted an affidavit for a federal warrant to search Bolling's residence.  In his affidavit, Special Agent Bullard included most of the information recounted above.  In particular, as to the nature of the property, he swore:

> 4.   On [] September 14, 2020, Task Force Officer Weaver
> ("TFO Weaver") and Task Force Officer Thomas ("TFO
> Thomas") interviewed a source of information ("SOI")
> regarding the trafficking of illegal narcotics, such as
> heroin and meth.  The SOI identified the target as Mark
> Alan BOLING[1] living at 117 Keystone Drive in
> Charleston, WV 25311.  He stated BOLING had in his
> possession several firearms.
>
> 5.   The SOI advised he has known Boling for an
> extended period of time and is familiar with him.
> The SOI stated that he has purchased illegal
> narcotics from Boling.  The SOI described the
> address/structure to be a yellowish in color, two
> story, 4 unit apartment building.  SOI advised
> that the driveway to the apartment complex is a
> horseshoe and there are storage units behind it.
> The source's description of BOLING's address has
> since been confirmed by surveillance and a
> controlled purchase of methamphetamine.
>
> 6.   The SOI stated that he has seen several ounces of
> meth and several ounces of heroin inside BOLING's
> residence, specifically in BOLING's bedroom (top
> left apartment).  The SOI stated that he has
> witnessed several firearms inside the residence

---

[1] In the search warrant affidavit, defendant's last name is spelled "Boling".

and has personally witnessed [] BOLING trading a
firearm for narcotics.  The SOI believed BOLING to
be a convicted felon because BOLING had stated he
had done time in the 80-90's for weapon offenses.
SOI also advised that he has witnessed individuals
bring[] firearms to BOLING and sell them to him. .
. .

7.   The SOI stated that he knows firearms well and
     believes there are approximately 20 firearms
     inside the apartment complex housed in a safe in
     the building.  SOI has stated that the other units
     are unoccupied but used to house guns and illegal
     narcotics by BOLING.

10.  R.A.C. Black pulled tax information from the
     Kanawha County Assessor's Office for BOLING and
     found that BOLING owns [] 117 Keystone Drive and
     [the] land around it, which includes a multi bay
     storage unit.

11.  SA David Bullard requested a mail watch on 117
     Keystone Drive, and he was informed that 117
     Keystone Drive does not receive mail.  SA David
     Bullard has not been able to find any information
     that individuals other than BOLING are living in
     any of the rooms at 117 Keystone Drive.

12.  SA David Bullard listened to a recorded jail call
     from BOLING to an unknown female asking her to
     move his "tools" from his bedroom to the room
     across the hall.  This is consistent with the
     information from the SOI that BOLING is in sole
     possession of the residence and all of the rooms
     therein.

14.  After arriving at 117 Keystone Drive, Charleston,
     WV, 25311, the CI entered through the front door
     and then made contact with BOLING. . . .

17.  On September 16, 2020, SA McNees along with SA
     Knoll reviewed the recordings of the above
     mentioned controlled purchase.  BOLING is visible
     on the recording inside of 117 Keystone Drive,
     Charleston, West Virginia.

ECF No. 115-1.

4

On September 21, 2020, the warrant was issued by United States Magistrate Judge Omar J. Aboulhosn.  The search warrant was executed the same day.  Bolling was not present when the warrant was executed as he was still incarcerated on the traffic stop.  During execution of the search warrant, law enforcement discovered persons other than Bolling were residing in the building located at 117 Keystone Drive.  Agents recovered an AR-style rifle with a silencer, a .380 caliber pistol, and a box of .45 caliber ammunition in an apartment where a man named Donald Jordan was living.  Jordan denied ownership of the firearms and told agents executing the search warrant that Bolling and his wife had access to his apartment.  Also recovered during the search was a .45 caliber pistol in the trunk of a Toyota Camry parked outside the building.

## II.  Analysis

A.  _Franks_ Hearing

Bolling argued that he was entitled to a <u>Franks</u> hearing because law enforcement made false statements and material omissions from the search warrant for 117 Keystone Drive.  The gist of his argument is that Special Agent Bullard was not truthful when he stated there were no other occupants at 117 Keystone Drive and that he did so in order to search all the apartments, including Donald Jordan's.

At the February 10, 2023, hearing, Special Agent Bullard testified that he sought the search warrant because of the controlled buy and the traffic stop.  He confirmed that he checked property records and determined that Mark Bolling was the owner of record for 117 Keystone Drive.  Property records indicated that 117 Keystone Drive was a single-family residence.  Of his assertion in the affidavit that Bolling had access and control over all the rooms in the apartment building, SA Bullard testified that he came to that conclusion "[b]ased off conversations with the CI, the jail calls, the property tax return, and also we spoke with postal about the inbound mail, which they said there was no inbound mail going to that address."  ECF No. 227 at 8-9.  Bullard stated that he only discovered anyone other than Bolling was living at 117 Keystone Drive when they were executing the warrant.  During execution of the search warrant, Jordan informed law enforcement that he had been living there for "some time."  Id. at 13.  A rental agreement between defendant's wife, Teresa Bolling, and Jordan for the apartment was admitted into evidence.  Jordan informed SA Bullard that "other than to fix a water leak or things of that nature," he had not given anybody else permission to enter his apartment.  Id. at 14.

Of his reliance on information provided by Yates, Bullard testified that he considered Yates's criminal history but found

6

him reliable because the information he provided was partially corroborated during the controlled buy.  See id. at 42-45.  Of his assertion in the affidavit regarding surveillance on the property, Bullard stated that officers drove by the area after initially speaking to Yates and then again in connection with the controlled buy.  He testified about a pole cam that was in place for a few days but stated that any video from that time was not available.  According to Bullard, "[t]here [wa]s nothing of evidentiary value to the case on there.  I don't believe Mr. Bolling was home for the entirety of the pole cam being up."  See id. at 49.  As for the lack of observation of anyone receiving mail at 117 Keystone Drive, Bullard explained that "nobody saw mail coming and going or Mr. Bolling coming and going because they'd be watching it in real time."  Id. at 50.  Special Agent Bullard testified that, prior to seeking the search warrant, he never saw any tenants coming and going and nobody in the parking lot that would suggest tenants were living there.  Bullard also explained that he later discovered his request for a mail watch in September 2020 did not turn up anything because the Postal Service had the address in its system as "117 Keystone DR" rather than "117 Keystone Drive"."  Id. at 63.

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S.

Const. amend. IV.  "'[A]n accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit' by way of a motion to suppress." United States v. Pulley, 987 F.3d 370, 376 (4th Cir. 2021) (quoting United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011)).  Affidavits supporting search warrants are presumptively valid.  See Franks v. Delaware, 438 U.S. 154, 171 (1978).  "'A Franks hearing provides a criminal defendant with a narrow way to attack the validity' of a search-warrant affidavit." United States v. Haas, 986 F.3d 467, 474 (4th Cir. 2021) (quoting United States v. Moody, 931 F.3d 366, 370 (4th Cir. 2019)).  To obtain such a hearing, a defendant must "overcome the 'presumption of validity'" afforded the affidavit supporting the search warrant. Id. (quoting Moody, 931 F.3d at 370).

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Franks, 438 U.S. at 155-56.

"Along with affirmative false statements, 'Franks protects
against omissions that are designed to mislead, or that are made
in reckless disregard of whether they would mislead, the
magistrate.'" Haas, 986 F.3d at 474 (quoting United States v.
Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (emphasis omitted)).

> When a defendant relies on an omission, this heavy
> burden is even harder to meet.  In that situation, a
> defendant must provide a substantial preliminary
> showing that (1) law enforcement made an omission; (2)
> law enforcement made the omission knowingly and
> intentionally, or with reckless disregard for the
> truth, and (3) the inclusion of the omitted evidence in
> the affidavit would have defeated its probable cause.
> If the district court finds that a defendant has made
> this threshold showing, it must hold a Franks hearing
> to develop evidence on the affidavit's veracity.

Haas, 986 F.3d at 474 (internal quotations and citations
omitted).

> Th[e Fourth Circuit] has stated previously that
> reckless disregard in the Franks context requires a
> showing that the affiant personally recognized the risk
> of making the affidavit misleading. . . .  What the
> officer-affiant should have known does not matter if he
> did not in fact know.  Reckless disregard is a
> subjective inquiry; it is not negligence nor even gross
> negligence.  To establish a Franks violation, the
> particular affiant must have been subjectively aware
> that the false statement of omission would create a
> risk of misleading the reviewing magistrate judge and
> nevertheless chose to run that risk.

Pulley, 987 F.3d at 377 (emphasis in original).

Bolling contends that the warrant affidavit contains not
only false statements but also material omissions.

First, Bolling argues that the affidavit contains no
information regarding Yates's reliability as a source of

9

information.  This argument is without merit.  This is a
conclusory allegation that does not identify specific information
about Yates that was omitted and "could have formed the basis to
grant a Franks hearing."  Haas, 986 F.3d at 475.  As the Haas
court put it in rejecting a similar conclusory allegation about
an informant's reliability, "[i]f these unidentified 'outcomes'
[of prior work as an FBI informant] were known and consistently
showed that Sarah provided misinformation, they could have formed
the basis to grant a Franks hearing."  Id.[2]

Nor does the affidavit's failure to include Yates's criminal
history, entitle Bolling to a Franks hearing.

> [A]n affiant cannot be expected to include in an
> affidavit every piece of information gathered in the
> course of an investigation. . . .  Instead, to satisfy
> Franks's intentionality prong, law enforcement must
> have omitted the information to mislead the magistrate
> judge or in reckless disregard of whether it would be
> misleading. . . .  An officer acts with reckless
> disregard when she fails to inform the magistrate of
> facts she subjectively knew would negate probable
> cause. . . .  And the mere fact that information was
> omitted from an affidavit cannot alone show
> recklessness or intentionality.
>
>                         * * *
>
>      Haas also argues that we should find that the
> agent acted at least recklessly in omitting Sarah's
> criminal history from the affidavits because a
> reasonable officer would have known that the omission

---

[2] Yates's reliability was bolstered by the controlled buy,
captured on video, and the fact that he implicated himself in
criminal activity.  See United States v. McCallister, CRIMINAL
ACTION NO. 3:19-00153-01, 2020 WL 4607321, at *4 (S.D.W. Va. Aug.
11, 2020) (Chambers, J.).

of witness credibility information violated clearly
established precedent.  But that is not the test for
determining whether an officer has acted recklessly in
omitting information from a warrant affidavit, and Haas
provides no precedent to the contrary. . . .  Haas
presented no evidence that the agent subjectively knew
that his failure to include Sarah's criminal history in
the warrant affidavits would mislead the magistrate,
and indeed, the record itself points to the opposite
conclusion.

Id. at 475-76.

Finally, Bolling seems to suggest that a lack of
corroborating evidence regarding the information received from
Yates entitles him to a Franks hearing.  See ECF No. 115 at 4
("[C]orroboration can confirm the reliability of an informant who
is known (rather than anonymous) but whose credibility is unknown
to the officer. . . .  Some corroboration is still required with
no track record of reliability.").  He is wrong.  As the Haas
court explained:

The third purported omission, additional
corroborating evidence, fails for a more fundamental
reason.  At its core, this is an argument that the
warrant affidavits lacked probable cause, not that the
omitted material was intentionally or recklessly
omitted and would have negated probable cause.  There
was no additional corroborating evidence that the
affiant could include that would have defeated probable
cause for arrest, as corroborating evidence could have
only strengthened the affidavit.  Instead, Haas is
arguing that the affidavits did not present enough
evidence to meet the probable-cause standard.  But the
presence (or absence) of probable cause is not the
proper subject of a Franks hearing.

Haas, 986 F.3d at 475.

Bolling maintains that the search warrant affidavit makes the following misrepresentations or omissions:

7)   SOI (source of information) has stated that the other units are unoccupied but used to house guns and illegal narcotics by Boling.

11)   SA David Bullard requested a mail watch on 117 Keystone Drive, and he was informed 117 Keystone does not receive mail.  SA David Bullard has not been able to find any information that individuals other than Boling are living in any of the rooms at 117 Keystone Drive.

12)   S.A. Bullard listened to a recorded jail call from Boling to an unknown female asking her to move his "tools" from his bedroom to the room across the hall.  This is consistent with the information from the SOI that Boling is in sole possession of the residence and all of the rooms therein.

14)   After arriving at 117 Keystone Drive, Charleston, WV, the CI entered through the front door and then made contact with Boling.  After meeting with Boling, the CI then returned to the prearranged location.

17)   On September 16, 2020, SA McNees along with SA Knoll and reviewed the recordings of the above mentioned controlled purchase.  Boling is visible on the recording inside of 117 Keystone Drive, Charleston, West Virginia 25311.

ECF No. 115 at 6-8.

The court found that Bolling had not satisfied any of the prongs under Franks.  First, Bolling did not make a sufficient showing that any of the statements were actually false.  With respect to the allegation that the affidavit is false because Brett Yates never told ATF "that the other units are unoccupied but used to house guns and illegal narcotics by Boling," the

12

court did not find Brett Yates to be a credible witness.  Yates, who testified at the hearing on February 2, 2023, stated that he never told law enforcement that the other apartments were unoccupied.  Yates further testified that he knew people, other than Bolling, were living at 117 Keystone Drive.  He went on to deny telling law enforcement much of the information attributed to him in the search warrant affidavit.

At the time he testified, Yates was incarcerated and waiting to go to prison on his state court convictions for burglary and attempt to commit a felony by fraudulent use of an access device. He admitted that he was afraid to testify against someone while he was incarcerated because it was dangerous to be a cooperator while in jail.  Upon cross examination, Yates also admitted that he sold drugs with Bolling and, during the timeframe of September 2020, he "was doing more drugs at that time in my life than probably any other" and that he "vaguely" remembered that period of time.  ECF No. 227 at 85-86; see also ECF No. 227 at 88 ("Q: You don't remember much from three years ago because of all the drugs you were using.  Is that what you're saying?  A: I mean, yeah.").  The court cannot find by a preponderance of the evidence that Yates did not make the statements attributed to him in the search warrant affidavit.

As for the other alleged misrepresentation that Bolling identified--that SA Bullard requested a mail watch--the court

13

likewise concludes that this statement was not false.  Special
Agent Bullard testified that he requested a mail watch.  He also
explained why his request for a mail watch did not show the
presence of other residents.  The court found SA Bullard
credible; there was no misrepresentation.

The court also finds that there was no misrepresentation in
paragraph 12 of the search warrant.  Although SA used the word
"bedroom" instead of "apartment," the affidavit does not suggest
that it was providing a verbatim account of the phone call.  "A
'defendant cannot rely on a purely subjective disagreement with
how the affidavit characterizes the facts.  Rather, there must be
evidence showing that the statements at issue are <u>objectively</u>
<u>false</u>.'"  <u>Pulley</u>, 987 F.3d at 379 (quoting <u>Moody</u>, 931 F.3d at 370
(4th Cir. 2019) (emphasis in original)).  The affidavit does not
mislead the magistrate judge regarding the fact that the unit is
divided into apartments.  Accordingly, the fact that SA Bullard
referred to a bedroom instead of an apartment was, at best, an
innocent mistake and the court found no reason to believe it was
designed to mislead the magistrate judge.

Concerning the alleged material omissions from paragraphs 14
and 17 of the search warrant affidavit, Bolling has failed to
show that the suggested omissions were made knowingly and
intentionally and with reckless disregard for the truth.  Nor did

he show that the inclusion of the omitted evidence in the affidavit would have defeated its probable cause.

Based upon the foregoing, the court concluded that Bolling failed to make the required substantial preliminary showing and denied his motion for a <u>Franks</u> hearing.[3]  The court found Special Agent Bullard neither deliberately misled the magistrate judge nor did he act with reckless disregard for the truth.  There is no evidence that Bullard knew other people were living at 117 Keystone Drive when he swore out his affidavit.  "An officer who does not personally know information cannot intentionally or recklessly omit it[.]"  <u>Id.</u> at 379.

---

[3] Bolling essentially got a <u>Franks</u> hearing.  Counsel for defendant admitted that if the court granted the motion for a <u>Franks</u> hearing the evidence presented would likely be the same evidence presented at the February 2, 2023 hearing in which he attempted to establish Bolling's entitlement to such a hearing.  <u>See</u> ECF No. 227 at 76-77 (Court: If you get a <u>Franks</u> hearing, what are you going to do beyond what you've done here today?  Counsel: Well, essentially you know - - I mean, I had - - just some more beating of a dead horse, Your Honor.  But, I mean, that's essentially, you know, what we would present. . . .  And with regard to the <u>Franks</u> hearing as well I have a witness - - if we get a <u>Franks</u> hearing, I have a witness that's going to testify that much of this information, again, is false.  Court: I think you better put him on, Mr. Yost.  And let's get through it with dispatch.  Okay? . . .  Counsel: Okay.  I'll call Brett Yates.").  At that hearing, Bolling's witnesses were Special Agent Bullard and Brett Yates.  Agent Bullard explained what happened with the mail watch and the court found him credible.  Brett Yates testified that he did not provide some of the information attributed to him in the affidavit.  As noted above, the court did not find Mr. Yates to be a credible witness.  Therefore, even if a <u>Franks</u> hearing had been held, Bolling would not be able to establish "perjury or reckless disregard" by a preponderance of the evidence.

B.  *Motion to Suppress*

Bolling argued that the search warrant was also invalid for lack of particularity and probable cause.  The government maintained that defendant did not have standing to challenge the search warrant insofar as he sought to exclude the items recovered from Donald Jordan's apartment or the Toyota Camry.

1.  Standing

The Fourth Amendment protects "against unreasonable searches and seizures."  U.S. Const. amend. IV.  It "protects people, not places."  <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967).  Accordingly, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."  <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-34 (1978) (quotation omitted).

> Suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself—those who have standing—not by those who are aggrieved solely by the introduction of damaging evidence.  <u>Alderman v. United States</u>, 394 U.S. 165, 171-72, 89 S. Ct. 961, 22 L. Ed.2d 176 (1969). . . .  A person has standing to contest a search or seizure only when they have a reasonable expectation of privacy in the evidence.

<u>United States v. Coleman</u>, 536 F. Supp.3d 80, 86 (S.D.W. Va. Apr. 28, 2021) (Goodwin, J.); <u>see also</u> <u>Rakas</u>, 439 U.S. at 134 ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his

16

Fourth Amendment rights infringed.").  "The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant."  United States v. Castellanos, 716 F.3d 828, 832 (4th Cir. 2013).[4]  "The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found."  United States v. Manbeck, 744 F.2d 360, 374 (4th Cir. 1984).

The court agrees that Bolling does not have standing to contest the seizure of the evidence recovered from Donald Jordan's apartment.  Judge Goodwin recently had a similar case in which a defendant sought to suppress all evidence recovered during execution of a search warrant, including evidence recovered from a private bedroom occupied and rented by someone else.  See Coleman, 536 F. Supp.3d at 86.  Judge Goodwin concluded that the defendant did not have standing to challenge the search of that other room and the seizure of the items found within it.  See id.  As he explained:

> Before considering the merits of Defendant's Motion to Suppress, I must ensure that the Defendant is the proper person to contest the seizure of all the evidence in question.  Evidence was seized from four locations:  the bookbag in the side yard, the living

---

[4] The Castellanos court explained that "the concept of 'standing' as it is used in the Fourth Amendment context is largely subsumed by substantive Fourth Amendment law, which views the concept through the lens of a reasonable expectation of privacy.  Put another way, the Supreme Court has moved away from an independent doctrine of 'Fourth Amendment standing.'" Castellanos, 716 F.3d at 832 n.3.

room, Defendant's private bedroom, and the private
bedroom occupied by Sheldon Mitchell.  Defendant was a
tenant of the home, renting a room, while Mr. Mitchell
was the guest of another tenant, staying in a separate
bedroom.  It is well-settled that the Defendant had a
reasonable expectation of privacy inside his own
private bedroom, the common areas of the house he was
renting, and in the curtilage of the home, but I cannot
say the same for the bedroom occupied by Mr. Mitchell.
The bedroom occupied by Mr. Mitchell was rented by
someone other than the Defendant.  Each bedroom could
be locked from the inside.  I find that the Defendant
had no reasonable expectation of privacy in the room
occupied by Mr. Mitchell.  Therefore, the Defendant is
not the proper person to bring a challenge to the
search of that room and the items found within it.  The
Defendant's Motion to Suppress as it pertains to the
items discovered inside the private room occupied by
Mr. Mitchell is **DENIED**.

Id.  Just as the defendant in Judge Goodwin's case did not have a

reasonable expectation of privacy in a room rented by another,

Bolling does not have a reasonable expectation of privacy in

Donald Jordan's apartment.

Nor does Bolling's ownership of 117 Keystone Drive, in and

of itself, establish he has standing to challenge the search of

Donald Jordan's apartment.  "While property ownership is clearly

a factor to be considered in determining whether an individual's

Fourth Amendment rights have been violated, property rights are

neither the beginning nor the end of this Court's inquiry."

United States v. Salvucci, 448 U.S. 83, 91 (1980) (internal

citation omitted); see also Shamaeizadeh v. Cunigan, 338 F.3d

535, 544 (6th Cir. 2003) ("[O]wnership alone does not justify a

reasonable expectation of privacy.  The Supreme Court has

consistently held that privacy interests are coterminous with one's property rights."). "It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant." Tarantino v. City of Hornell, 615 F. Supp.2d 102, 109 (W.D.N.Y. 2009) abrogated on other grounds, Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135 (2d Cir. 2010)). A case from the United States District Court for the Western District of New York addressed the issue of standing in the context of a multi-apartment building owned by the defendant.

> "[W]ith respect to the lower apartment, apart from his ownership of the premises, Defendant has failed to submit any information to meet his burden to establish that he had an expectation of privacy with respect to the lower apartment. . . .
>
> Defendant's ownership of the property is certainly a fact to be considered in assessing whether he had an expectation of privacy in the lower apartment, but arcane concepts of property law do [do not] . . . control the ability to claim the protections of the Fourth Amendment. . . . Factors other than property ownership that must be considered in assessing standing to challenge a search include whether the defendant had a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has demonstrated a subjective expectation of privacy, and whether he took precautions to maintain his privacy. . . . Here, Defendant has failed to submit any evidence with respect to these other factors, and his sole reliance on his ownership of the property is insufficient to establish standing.

United States v. Thompson, 1:18-CR-00126 EAW, 2020 WL 408354, at *5 (W.D.N.Y. Jan. 24, 2020) (cleaned up); see also Shamaeizadeh,

19

338 F.3d at 545 ("Shamaeizadeh had no expectation of privacy in the basement of the residence; any expectation of privacy in the basement belonged solely to the lessees[.]"); United States v. Knox, Nos. 02-3385, 03-3080, 01-40017, 2005 WL 1259633, at *8 (D. Kan. May 27, 2005) ("It follows that a landlord lacks standing to assert a Fourth Amendment claim as to residential property leased to another.").

Even assuming there was some defect in the warrant obtained to search his apartment, Bolling never explains how that gives him standing to challenge the search of Jordan's apartment.  To the extent his argument rests on the use of a single warrant affidavit to search both his apartment and Jordan's apartment, that does not give him standing to challenge searches of areas in which he has no privacy interest.  See United States v. Wei Seng Phua, 100 F. Supp.3d 1040, 1056 (D. Nev. 2015) ("The Government searched villas 8888 and 8881 without valid warrants, but Phua has not standing to challenge those searches.  Only the tenants of those units could directly challenge the searches based on invalid warrants. . . .  Phua has failed to provide any authority or analysis explaining how defects in the warrant affidavit to search villa 8882 provide him standing to challenge the searches of villas 8881 and 8888, given that he had no reasonable expectation of privacy in those other villas.").

The government also argues that Bolling does not have a reasonable expectation of privacy in the Camry as he has not even made a threshold showing of standing and has disclaimed ownership in the vehicle.  This presents a closer question.

Ordinarily, "[i]t is well-established that an individual does not have a reasonable expectation of privacy in another person's automobile." United States v. O'Neal, 16 F. App'x 539, 541 (8th Cir. 2001); see also United States v. Crockett, Criminal Action No. 14-00256-01-CR-W-RK, 2016 WL 1603410, at *9 (W.D. Mo. Feb. 25, 2016) ("I have found no other case suggesting that defendant would have a legitimate expectation of privacy in a vehicle for no other reason than it was parked in his driveway."). But see United States v. Gomez, 276 F.3d 694, 697 (5th Cir. 2001) (homeowner had reasonable expectation of privacy in vehicle parked in his driveway but owned by third person).

There is no evidence in the record regarding ownership of the Camry.  In court proceedings, Bolling has disclaimed ownership of the vehicle.  However,

> [d]isclaimer of an interest in property is a recognized
> basis for loss of standing to mount a Fourth Amendment
> challenge to the seizure or search of that property.
> See, e.g., United States v. Lewis, 921 F.2d 1294, 1302
> (D.C. Cir. 1990) ("A voluntary denial of ownership
> demonstrates sufficient intent of disassociation to
> prove abandonment."). . . .  Nonetheless, the timing of
> such a disclaimer matters:  It is effective only as to
> a subsequent search of seizure of the item.  See, e.g.,
> United States v. O'Brien, 498 F. Supp.2d 520, 535
> (N.D.N.Y. 2007) ("When assessing whether police
> reasonably seized a disclaimed item, the critical issue

is whether a suspect took action to protect his privacy
interest at the time of the seizure, not whether he
expressed a contrary position at some later time."). .
. . In this case, the defendant had not disclaimed
ownership of the Motorola cell phone (or relinquished
his privacy interest in its contents) at the time of
the challenged search. He therefore retains standing
to challenge that search.

United States v. Curry, Criminal No. 07-100-P-H, 2008 WL 219966,
at *8 (D. Me. Jan. 23, 2008); see also United States v.
Templeton, No. CR-09-00459-PHX-ROS, 2010 WL 3025514, at *2 (D.
Ariz. Aug. 2, 2010) ("The issue here is whether an abandonment
after an illegal search occurred should be deemed effective.  It
should not.").

As noted above, Bolling did not disclaim an interest in the
Camry at the time of the search.  Nor could he; he was
incarcerated.  Under the facts and circumstances of this case and
with the benefit of the foregoing authorities, the court found
that defendant did have standing to object to the search of the
Camry.

2.  Probable Cause

Bolling argued that the search warrant failed to establish
probable cause to search the property[5] and the Camry.  The court
disagrees.

---

[5] Even though the court has concluded that Bolling does not
have standing to challenge the search of Donald Jordan's
apartment, it nevertheless considered whether the warrant was
supported by probable cause.

Courts "review a magistrate judge's decision to issue a search warrant with great deference, asking only whether the judicial officer had a substantial basis for finding probable cause." United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020) (quotation marks and citation omitted).  "Whether probable cause for a search exists is a practical, common-sense question, asking whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (internal citation and quotation marks omitted). "Probable cause requires only 'the kind of fair probability on which reasonable and prudent people, not legal technicians,' would rely." United States v. Jones, 952 F.3d 153, 158 (4th Cir. 2020), cert. denied, 141 S. Ct. 1080 (2021) (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)).

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Brown v. Lott, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (quoting Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)).  In other words, the suspect must only engage in conduct that warrants suspicion. See United States v. Orozco, 41 F.4th 403, 407 (4th Cir. 2022) (quoting United States v. Gondres-Medrano, 3 F.4th 708, 713 n.1 (4th Cir. 2021)). Probable cause is "not a high bar." Blakeney, 949 F.3d at 859.

In Orozco, the Fourth Circuit explained the necessary findings for probable cause: (1) whether there was a "fair probability" that the defendant engaged in a criminal activity and (2) whether a "substantial basis" existed for believing evidence of the crime could be found on the item to be searched. Id. at 408-09.

In this case, Special Agent Bullard's affidavit demonstrated a fair probability that Bolling was engaged in criminal activity and that evidence of his crimes would be found at 117 Keystone Drive. Significantly, just days earlier a controlled-buy of narcotics had taken place at Bolling's residence. During that controlled-buy, defendant was heard discussing selling firearms a few days earlier. Furthermore, on September 19, 2020, Bolling was arrested incident to a traffic stop after the discovery of a significant amount of drugs, ammunition, and a large quantity of cash in the vehicle he was driving. As for the reliability of Yates as a source of information, his information was corroborated in several respects but most significantly through the controlled buy.

Accordingly, there is not merit to Bolling's argument that the search warrant was not supported by sufficient probable cause.

3. Particularity

It is well-settled that the Fourth Amendment does not set forth some general particularity requirement.

24

So long as there is probable cause to believe that
contraband or evidence of a crime will be found in a
particular place, the Fourth Amendment specifies only
two matters that must be particularly described in the
warrant:  the place to be searched and the persons or
things to be seized.

United States v. Cobb, 970 F.3d 319, 326-27 (4th Cir. 2020)

(cleaned up).  Attachments A and B to the search warrant

affidavit clearly set out the place to be searched and the things

to be seized.  The warrant satisfies the Fourth Amendment's

particularity requirement.

4.   The Good Faith Exception

Even if the warrant for the search of 117 Keystone Drive was

somehow deficient, Leon's good-faith exception to the

exclusionary rule would apply and suppression is not warranted.

"Evidence obtained in violation of the Fourth Amendment . . . is

generally subject to suppression under the exclusionary rule."

United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004).  The

exclusionary rule breathes life into the Fourth Amendment's

guarantees by deterring "future Fourth Amendment violations," not

by providing a personal right of exclusion to redress a Fourth

Amendment injury.  See Davis v. United States, 564 U.S. 229, 236

(2011).  Because deterrence is the "sole purpose" of the

exclusionary rule, the Supreme Court has limited its "operation

to situations in which this purpose is 'thought most

efficaciously served.'"  Id. at 237 (quoting United States v.

Calandra, 414 U.S. 338, 348 (1974)).  "To trigger the

25

exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009).

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court established an exception to the exclusionary rule. This exception was to address cases where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." Id. at 920. The Court explained,

> In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.

Id. at 920-21.  And deterring magistrates "is not the office of the exclusionary rule." Davis, 564 U.S. at 239.

"When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." Leon, 468 U.S. at 924.  "As a general rule, when a neutral magistrate has issued a warrant, the issuance 'suffices to establish' that a law enforcement officer has 'acted in good faith in conducting

26

the search.'"  United States v. Skinner, No. 3:19CR19, 2021 WL

1725543, at *20 (quoting Leon, 468 U.S. at 922).

There are four circumstances, however, where the good faith

exception does not apply:

> • First, where the magistrate or judge in issuing a
> warrant was misled by information in an affidavit that
> the affiant knew was false or would have known was
> false except for his reckless disregard of the truth;
>
> • Second, where the magistrate acted as a rubber stamp
> for the officers and so wholly abandoned his detached
> and neutral judicial role;
>
> • Third, where a supporting affidavit is so lacking in
> indicia of probable cause as to render official belief
> in its existence entirely unreasonable; and
>
> • Fourth, where a warrant is so facially
> deficient—i.e., in failing to particularize the place
> to be searched or the things to be seized—that the
> executing officers cannot reasonably presume it to be
> valid.

See United States v. Williams, 548 F.3d 311, 317–18 (4th Cir.

2008) (internal quotation marks, alterations, and citations

omitted).  In these four circumstances, reliance on the warrant

is unreasonable.  See id. at 317.

Unlike determining whether there was a substantial basis for

the probable cause determination (whether the warrant was valid),

in the good faith analysis, our Court of Appeals has

"consistently rejected the notion that reviewing courts may not

look outside the four corners of a deficient affidavit when

determining, in light of all the circumstances, whether an

officer's reliance on the issuing warrant was objectively

27

reasonable." <u>United States v. McKenzie-Gude</u>, 671 F.3d 452, 459 (4th Cir. 2011).  What is still forbidden, however, is an inquiry "into the subjective <u>beliefs</u> of law enforcement officers." <u>Id.</u> at 460 (emphasis in original).  In other words, courts may consider "actual uncontroverted facts known to . . . [the] officer," but may not engage in "fruitless inquiries into the minds of police officers to ascertain motive." <u>See id.</u> (citation and question marks omitted).

All that the government must show is that law enforcement's reliance on the warrant here was not entirely unreasonable. "This is a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." <u>United States v. Bynum</u>, 293 F.3d 192, 195 (4th Cir. 2002).  Reliance here was not entirely unreasonable.

The evidence here showed that Special Agent Bullard was not dishonest or reckless in his preparation of the affidavit to support probable cause.  As explained above, there is no reason to believe he misled Magistrate Judge Aboulhosn as to the search warrant, thus negating the exception to the good faith rule established in <u>Leon</u>. Furthermore, as explained above, his supporting affidavit sets forth ample basis for the probable cause finding, and the places to be searched and items to be seized were limited to those places and things reasonably connected to defendant's suspected drug trafficking.  Nor can the

28

court conclude that Magistrate Judge Aboulhosn wholly abandoned his role as a neutral and detached magistrate. Accordingly, <u>Leon</u> would apply even if the warrant at issue were invalid.

### III. Conclusion

Based on the foregoing, defendant's motion for a <u>Franks</u> hearing and to suppress evidence recovered during the search of 117 Keystone Drive were denied.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record and to the Probation Office of this court.

IT IS SO ORDERED this 31st day of July, 2023.

ENTER:

David A. Faber
Senior United States District Judge

29