```
            IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON
```

UNITED STATES OF AMERICA

v.                                  CRIMINAL NO. 2:21-00087

MARK BOLLING

## MEMORANDUM OPINION

On January 10, 2023, the court held a hearing on defendant Mark Bolling's motion to suppress. (ECF No. 118). Present at that hearing were defendant, his counsel, Brian D. Yost, and Assistant United States Attorneys Nowles H. Heinrich and Steven I. Loew. On February 10, 2023, the court denied defendant's motion. This Memorandum Opinion sets out more fully the reasons for that ruling.

### Factual Background

In the early morning on September 19, 2020, Patrolman Timothy Farley of the Fayetteville Police Department was monitoring traffic from a stationary position on Route 19 in the City of Fayetteville in Fayette County, West Virginia. At approximately 2:52 a.m., Farley observed a vehicle traveling southbound on Route 19 at a high rate of speed. Radar confirmed that the vehicle, a Nissan Kick, was exceeding the speed limit by driving 68 miles per hour in a zone with a 55 miles per hour speed limit. Deputy Levi Garretson also observed the vehicle

1

speeding and directed Farley to pull the vehicle over. Farley testified that he was going to pull the vehicle over even before Garretson radioed him.

Patrolman Farley initiated a stop of the vehicle he observed to be speeding. He called in the registration tag information to the dispatcher but he did not remember if he received anything back. Once the vehicle had stopped, Farley approached the driver's side of the vehicle and made contact with the driver, Bolling. There were two other individuals in the vehicle as well. Patrolman Farley requested proof of registration, proof of insurance, and a driver's license from defendant. According to Farley, Bolling was unable to provide him with any of the requested information. Farley also observed that the airbag had been deployed because the airbag cover was gone and the airbag was missing.

Once Bolling failed to provide the requested information, including a driver's license, Farley had Bolling exit the vehicle and move to the rear of the vehicle. According to Farley, Bolling would not make eye contact with him and seemed "very, very nervous." At 2:55 a.m., Patrolman Farley called in the name of Samuel Burdette, one of the passengers in the vehicle. He asked for a check to see if Burdette had any outstanding warrants. Burdette was sitting in the back seat of

the vehicle while the other passenger, Christopher Smith, was sitting in the front passenger's seat. Although Patrolman Farley testified that he "usually" checked warrants on every passenger and driver when he pulled over a vehicle, he could not remember why he did not run Bolling's name.

At approximately 3:00 a.m., dispatch informed Patrolman Farley that Samuel Burdette's license was expired and that he did not have any outstanding warrants. The Call Detail Report confirms that sometime before 2:59 a.m. Patrolman Farley asked dispatch to run information for Samuel Dylan Burdette and the information was provided at 2:59 a.m. and indicated that Burdette's license was expired.

Farley asked Bolling where he was coming from and where he was going. Bolling told him that he was coming from Hico and headed to Charleston. Farley also asked Bolling what had happened to the vehicle to make the airbag deploy. At some point while Farley and Bolling were talking at the rear of the vehicle, Farley learned that the vehicle was a rental. Bolling was unable to provide information regarding the rental.

At 3:12 a.m., Patrolman Farley requested a K-9 unit based upon his suspicion that a crime had been committed. Patrolman Farley felt that defendant's story was suspicious because the route he was taking did not "make sense" to him. According to

3

Farley, there was a much shorter route from Hico to Charleston. Farley also related that Bolling acted nervous. He was suspicious because the airbag had been removed and Bolling could not provide any information regarding the vehicle. Bolling's inability to provide proof of insurance also made Patrolman Farley suspicious. According to Farley, he had a reasonable suspicion that a crime was being committed but was unsure about the nature of the crime. He was concerned the vehicle might have been stolen but "there could have been warrants, bodies, vehicle stolen, possible drugs in the vehicle." Dispatch informed Farley it was having trouble contacting the K-9 unit.

 According to Patrolman Farley, he had decided to have the vehicle towed when Bolling was unable to provide proof of insurance. Farley testified that he tows every vehicle that does not have insurance. Because he was going to have the vehicle towed, he needed to have the passengers exit the vehicle as well. However, for officer safety reasons, Farley needed backup before he could do so because he would not want to leave Bolling standing behind the vehicle by himself. Farley also testified that he would be concerned about having three people outside the vehicle if he were alone. Tyler McMillion, Farley's supervisor, confirmed that it was Fayetteville Police Department policy to have a vehicle towed when proof of insurance was not

provided. Therefore, Bolling would not have been free to drive away after receiving a speeding ticket because the car had to be towed.

Approximately ten minutes into the traffic stop, Patrolman McMillion arrived at the scene. Farley had Christopher Smith and Samuel Burdette exit the vehicle. Once Smith exited the vehicle, Patrolman Farley observed a clear, plastic bag in the passenger's side floorboard of what he believed to be marijuana. Upon observing the suspected marijuana, Farley began a search of the vehicle. During the search, he discovered over 100 grams of suspected methamphetamine, approximately 30 grams of suspected heroin, ammunition, and approximately $7,000. The drugs and ammunition were recovered from the driver's side door panel while the money was recovered from the backseat.

McMillion stood with the occupants of the vehicle while it was searched. Deputy Garretson arrived to assist Farley's traffic stop at approximately 3:24 a.m. According to Garretson, when he arrived, Bolling, Smith, and Burdette were already in police cars and narcotics were on the hood of the car, indicating that the search had been completed.

Bolling also testified at the suppression hearing. According to him, the Nissan Kick was rented by Heather Murphy and he had her permission to drive it. Bolling had known Murphy

5

for approximately three months. Bolling testified that while he did not have a driver's license, he did have a learner's permit. Bolling admitted that he did not provide Farley proof of insurance on the vehicle although he maintains that he did provide his learner's permit.

The court found Patrolman Farley to be a credible witness. Deputy Garretson and Patrolman McMillion were likewise credible. Bolling's testimony was not entirely credible. The court finds credible Patrolman Farley's assertion that Bolling did not provide a driver's license or learner's permit to him when he asked for a license.

Bolling moved to suppress "all evidence illegally seized as the result of [the] September 19, 2020, vehicle stop and subsequent warrantless search of Mr. Bolling's vehicle conducted by Patrolman T.L. Farley and T.B. McMillion of the Fayetteville (West Virginia) Police Department ("FPD")." ECF No. 118 at 1. According to defendant:

> Mr. Bolling submits that his Fourth Amendment rights were violated when Patrolman Farley failed to diligently pursue the initial basis for the stop – speeding – and instead expanded the stop into a full-blown investigation of potential drug trafficking activity without reasonable suspicion to do so. Because the stop was extended beyond the time necessary to complete the writing of a citation and other lawful attendant matters, it constituted an unreasonable seizure of Mr. Bolling, his vehicle, and

6

    his passengers, thus rendering the subsequent search of the vehicle unreasonable.

Id. at 3.  In its opposition to defendant's motion, the government argued that defendant's Motion was without merit because "Bolling was unable to provide proof of insurance to the police, thereby justifying the seizure of the rental vehicle." ECF No. 136 at 19.

## Discussion

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'" under the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809-10 (1996).  It is well settled that a traffic stop amounts to a "seizure" under the Fourth Amendment and therefore must "not be 'unreasonable' under the circumstances." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008); United States v. Villavicencio, No. 18-4681, 825 F. App'x 88, 95 (4th Cir. Aug. 17, 2020) ("A traffic stop, therefore, must satisfy the Fourth Amendment's reasonableness limitation.").

7

"Under Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968), an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004). And, "[b]ecause a traffic stop is more akin to an investigative detention than a custodial arrest," the two-prong standard articulated in Terry is used to determine whether a traffic stop is reasonable. United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015).

The United States Court of Appeals for the Fourth Circuit described the analysis under Terry as follows:

> Pursuant to Terry, a traffic stop comports with the reasonableness standard of the Fourth Amendment where (1) the stop [i]s legitimate at its inception and (2) the officer's actions during the seizure [are] reasonably related in scope to the basis for the traffic stop. An initial traffic stop is warranted where an officer has probable cause to believe that a traffic violation has occurred. Nonetheless, a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. For instance, [a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.
>
> The acceptable duration of a traffic stop is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns. Ordinary tasks related to a traffic stop include checking the driver's license, determining whether there are outstanding warrants

>against the driver, and inspecting the automobile's registration and proof of insurance. An officer can also ask about a rental car agreement. . . . These types of checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. In addition, an officer may permissibly ask questions of the vehicle's occupants that are unrelated to the violation, provided that doing so does not prolong the stop absent independent reasonable suspicion. In assessing the reasonableness of a stop, we consider what the police in fact do. Thus, the critical question is not whether the unrelated investigation occurs before or after the officer issues a ticket, but whether conducting the unrelated investigation prolongs—i.e., adds time to—the stop. A traffic stop becomes unlawful when tasks tied to the traffic infraction are—or reasonably should have been—completed.

Villavicencio, 825 F. App'x at 95 (cleaned up).

"To show the existence of reasonable suspicion, a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." United States v. Bowman, 884 F.3d 200, 213 (4th Cir. 2018) (internal citation and quotation omitted). Although the reasonable suspicion standard requires "at least a minimal level of objective justification," it "is less demanding than the probable cause standard or even the preponderance of evidence standard." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2021). "Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement

9

officers, 'not legal technicians.'" United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996)).

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." Branch, 537 F.3d at 335. And, "pursuant to such a stop, a police officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." Id. (internal citation and quotation omitted).

"The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." Id. at 336. According to the court in Branch,

> Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver must be allowed to proceed on his way. Of course, if the driver obstructs the police officer's efforts in any way—for example, by providing inaccurate information—a longer traffic stop would not be unreasonable.
>
> If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the

10

stop in the first place. Thus, a prolonged automobile stop requires either the driver's consent or a reasonable suspicion that illegal activity is afoot. While a precise articulation of what constitutes reasonable suspicion is not possible, the precedents of the Supreme Court and this circuit suggest several principles that should animate any judicial evaluation of an investigatory detention pursuant to Terry.

First, Terry's reasonable suspicion standard is less demanding than probable cause. Indeed, in order to justify a Terry stop, a police officer must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity. Thus, the quantum of proof necessary to demonstrate reasonable suspicion is considerably less than a preponderance of the evidence.

Second, a court must take a commonsense and contextual approach to evaluating the legality of a Terry stop. To that end, the Supreme Court has noted that reasonable suspicion is a nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Thus, context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances. And respect for the training and expertise of police officers matters as well: it is entirely appropriate for courts to credit the practical experience of officers who observe on a daily basis what transpires on the street. In sum, post hoc judicial review of police action should not serve as a platform for unrealistic second-guessing of law enforcement judgment calls.

Third, a court's review of the facts and inferences produced by a police officer to support a Terry top must be holistic. Courts must look at the cumulative information available to the officer, and not find a stop unjustified based merely on a

piecemeal refutation of each individual fact and inference. A set of factors, each of which was individually quite consistent with innocent travel, could still, taken together, produce a reasonable suspicion of criminal activity. It is the entire mosaic that counts, not single tiles.

Fourth, a police officer's decision to stop and detain an individual must be evaluated objectively. Thus, the lawfulness of a Terry stop turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer's actions. In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent.

To sum up: If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle. The driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes. In order to demonstrate reasonable suspicion, a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot. Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement.

Id. at 336-37.

An officer needs either reasonable suspicion of criminal activity or consent if the officer "extend[s] the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose." Williams, 808 F.3d at 245-46.

12

As to the first prong of the Terry analysis, i.e., whether the stop was legitimate at its inception, the court finds that it was. Patrolman Farley had probable cause to initiate the stop based on his observation of Bolling's vehicle exceeding the speed limit. See Williams, 808 F.3d at 246 ("Williams does not dispute that Deputy Russell was entitled to stop the Hyundai for speeding."); Villavicencio, 825 F. App'x at 96 ("[W]e find that Wiessman had probable cause to initiate the stop based on her observation of Villavicencio's vehicle exceeding the speed limit."). Bolling does not argue otherwise.

Having determined that Bolling was lawfully stopped, under the second prong of the Terry analysis, the court determines whether Patrolman Farley's "actions during the seizure were reasonably related in scope to the basis for the traffic stop." Williams, 808 F.3d at 245. "The acceptable duration of a traffic stop 'is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns.'" Villavicencio, 825 F. App'x at 95 (quoting Rodriguez v. United States, 575 U.S. 348, 354 (2015) (internal quotation marks and citation omitted)).

In this case, the court credited the testimony of Patrolman Farley and Patrolman McMillion that the vehicle would have to be towed. Therefore, the government is correct that, given the

13

need to tow the vehicle after Bolling was unable to provide proof of insurance, the stop was not unnecessarily prolonged because Bolling was not free to drive away. See United States v. Perez, 30 F.4th 369, 376 (4th Cir. 2022) ("And once officers confirmed that the vehicle's plate was fictitious and that Perez's license was revoked, Perez couldn't simply drive away even if the citations had been issued. The officers testified that they called for the car to be towed, and it hadn't been by the time the dog sniff arrived."); see also id. at 377 (Motz J., concurring) ("I concur in the judgment because of the district court's factual finding that the need to tow Perez's car — after the officers determined it had a fictitious tag and that his license had been revoked — meant that Perez was not free to drive away after receiving the citations. Given this factual finding, I cannot say that the officers prolonged the stop in violation of the Fourth Amendment."); United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (holding that traffic stop was "justifiably extended . . . because of [the driver]'s legal inability to remove the vehicle from the scene and the consequential need for a licensed driver or a tow truck to do so."); United States v. Gladney, 809 F. App'x 220, 226 (5th Cir. 2020) (holding that traffic stop was not unreasonably extended where, during course of stop, officer discovered driver did not

14

have a valid license and "normal protocol is to either tow the vehicle, park and lock it, or have the driver call someone to come get it."); United States v. Santana-Vasquez, Docket no. 2:19-cr-00099-GZS, 2021 WL 6050930, at *3 (D. Me. Dec. 21, 2021) (holding that upon discovering that driver did not have a license and vehicle did not have a valid registration "the constitutional scope of the stop expanded to include any time necessary for a tow truck to arrive").

Furthermore, the original purpose of the original stop was never satisfied as Bolling failed to demonstrate to Patrolman Farley that his operation of the vehicle was lawful. "[T]he Fourth Circuit has held on several occasions, one of the purposes of a traffic stop is to ensure that the driver is legally operating the vehicle. . . . If that requirement is not satisfied, the stop is not at an end." United States v. Perez-Almeida, Criminal No. 3:19-cr-61, 2019 WL 4023075, at *6 (E.D. Va. Aug. 26, 2019); see also Branch, 537 F.3d at 336 ("Thus, once the driver has demonstrated that he is entitled to operate his vehicle . . . the driver must be allowed to proceed on his way. . . . Of course, if the driver obstructs the police officer's efforts in any way . . . a longer stop would not be unreasonable.") (internal citation and quotation omitted).

15

Furthermore, in this case, the stop was reasonable and prolonged in large part because of Bolling's failure to produce the requested documentation. "Importantly, the acceptable scope and duration of a traffic stop are not cabined by the stop's original justification if the police discover new suspicious information during the stop. Rather, 'as an investigation unfolds, an officer's focus can shift, and he can increase the scope of his investigation by degrees when his suspicions grow during the stop.'" United States v. Santana-Vasquez, Docket no. 2:19-cr-00099-GZS, 2021 WL 6050930, at *3 (D. Me. Dec. 21, 2021) (quoting United States v. Dion, 859 F.3d 114, 125 (1st Cir. 2017)); see also United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) ("When complications arise in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine."); United States v. Davis, 4 F.3d 989, at *3 (5th Cir. 1993) ("Although what transpired went beyond the bounds of a normal traffic stop, the extended duration of the stop was because of the fact that Haney had no driver's license, lied about his name, and could not produce any documentation indicating that he owned the truck.").

Based upon the evidence presented at the suppression hearing, the court concluded that the scope and duration of the

16

traffic stop were justified by the events that unfolded after the vehicle was stopped.  Defendant makes much of the duration of the vehicle stop but his argument completely sidesteps the emerging situation that Patrolman Farley confronted.  What began as a stop to address a speeding violation "mushroomed into other inquiries that each took time," Perez, 30 F.4th at 376, once Bolling failed to produce a driver's license, proof of insurance, or registration.

In any event, sufficient objective evidence existed to give Farley a reasonable suspicion "that illegal activity was afoot." Branch, 537 F.3d at 336.  The record shows that the traffic stop was initiated at 2:54 a.m., see Exhibit 1, and that the search of the vehicle was completed no more than 30 minutes later. After Farley stopped the vehicle at almost 3:00 a.m., he approached the driver who turned out to be Bolling.  According to Farley, he asked Bolling for his driver's license, registration, and proof of insurance.  Bolling failed to provide any of the requested information.  Patrolman Farley also observed the hole in the steering wheel where the airbag used to be.  At this point he asked Bolling to exit the car and move to the rear.

Patrolman Farley testified that because of Bolling's failure to provide insurance, he knew that he was going to have

17

the vehicle towed.  Farley testified that it was his practice to have a vehicle towed if the driver was unable to provide proof of insurance.  Officer McMillion corroborated Patrolman Farley's testimony on this point.  To have the vehicle towed, the passengers would need to be removed from the vehicle.  And, as Patrolman Farley testified, he needed additional law enforcement personnel to help in this endeavor.  See United States v. Hampton, 628 F.3d 654, 658 (4th Cir. 2010) (an officer may order passengers to get out of a vehicle pending completion of a traffic stop "as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk.").

Once Bolling moved to the rear of the car, Patrolman Farley asked him about his route.  This was not improper.  See Arizona v. Johnson, 555 U.S. 323, 333, 129 S. Ct. 781, 783, 172 L. Ed. 2d 694 (2009) ("[a]n officer's inquiries into matters unrelated to the" traffic violation "do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").  And, as Farley testified, he found the route suspicious because there was a more direct route.  Farley also learned that the car was a rental and stated that Bolling was acting nervous.  Farley maintains that, at this point, he suspected Bolling of additional criminal activity.

18

The court agrees with Farley that the universe of facts known to Farley at that point were sufficient to generate a reasonable suspicion of illegal activity. Those facts include: 1) a car speeding at almost 3:00 a.m.; 2) a driver who is unable to provide a driver's license, registration, or proof of insurance for that vehicle; 3) a hole in the steering wheel where the airbag should be; 4) the fact that the vehicle was a rental; 5) a travel route that was suspicious; and 6) a driver who acted nervous.

## Conclusion

Based on the foregoing, defendant's motion to suppress was denied.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record.

IT IS SO ORDERED this 31st day of August, 2023.

ENTER:

*David A. Faber*
David A. Faber
Senior United States District Judge